# Shirk's Case.

A State court or judge thereof has not power to discharge on habeas corpus, from the custody of the provost marshal, an individual arrested for desertion, under the seventh section of the act of Congress of 2d March, 1863.

Common Pleas of Centre County.

LINN, J.—This is a writ of habeas corpus addressed to the sheriff of Centre County, in which he is commanded to bring before the President Judge of the Court of Common Pleas of said county, the body of James Shirk, with the cause of his detention. It was issued at the instance of Jacob Shirk, the father of the prisoner, who claims that the said James is a minor, and that he is therefore, by law, entitled to his labor and services. The sheriff makes return that he holds him by authority and under the direction of the provost marshal of this district, who also, upon leave granted, files his return, admitting that he holds the prisoner in his custody, and claims the right to detain him, because as Provost Marshal of the Eighteenth Congressional District of Pennsylvania (of which the county of Centre forms a part), duly appointed and commissioned by the President of the United States, under the authority contained in the fifth section of the act of Congress of the 2d March, 1863, he arrested him as a deserter from the 45th Regiment of Pennsylvania Volunteers, in accordance with the powers and directions of the seventh section of the same act; that he was by his direction placed in custody of the sheriff of Centre County for safe keeping until he can be removed to the nearest military commander or military post. He further returns, that it is his legal duty to deliver the said deserter to the nearest military commander or military post, and that he intends to perform such duty as soon as possible. That the production of the prisoner in court would be inconsistent with and in violation of his duty as provost marshal. That the said deserter is now held under authority of the United States, and that therefore, without intending any disrespect to the judge who issued the writ, he declines to produce the prisoner, or permit him to be produced, or to subject him to the process of the said court. The counsel for the relator alleging that the return is insufficient, moves for an attachment to compel the defendant to make a more full and

[Shirk's Case.]

complete return to the writ. Before this return was made, however, and in the absence of the provost marshal, the sheriff had made another return, which afterwards, by leave granted, was withdrawn, and the present return permitted to be filed as a substitute therefor. Under the first return made by the sheriff the evidence upon which the relator relied for a discharge was heard, and we therefore have the whole case before us. From this it appears that the prisoner, contrary to the wishes of his father, ran away from home and enlisted in Captain Raphile's company in 1861. That he was sworn into the service of the United States, representing himself at the same time to be over eighteen years of age. The company to which he belonged afterwards joined the 45th Regiment of Pennsylvania Volunteers, which, soon after his enlistment, was ordered to South Carolina, and there remained nearly a year, when it returned to the neighborhood of Washington. There the prisoner fell sick, and was placed for treatment in one of the military hospitals, from which, without leave, he was removed by the relator and brought home, where he has remained ever since until arrested by authority of the marshal as a deserter. His grandmother swears that he was born on the 11th day of July, 1847, from which it seems that he was but fourteen years old when he entered the service, and is but little over sixteen at the present time. The relator claims his discharge because he was under eighteen when he entered the service. From an examination of the cases it would seem to be abundantly established, that the enlistment of a minor under the age prescribed by law, if not utterly void, is at least voidable for that cause; and we see nothing in the case to take it out of the general rule, nor do we discover aught that amounts to a ratification or confirmation of the contract, so as to make it binding. *Com.* v. *Fox*, 7 Barr, 336 ; *Grace* v. *Wilber*, 10 Johns, 435 ; *Com.* v. *Harrison*, 11 Mass. 63 ; *Com.* v. *Cushing*, Id. 67.

We are moreover clearly of opinion that the State courts have power to discharge, on habeas corpus, minors who are held to service under invalid contracts of enlistment. *Com.* v. *Fox*, *supra ; Carlton's Case*, 7 Cowen, 471. These and numerous other cases place this principle beyond doubt. If the case presented nothing more than an application for discharge from military service on the ground of minority, we could not hesitate to liberate the prisoner. But the defendant denies our jurisdiction over the case, and consequently our authority to interfere, on the ground that the prisoner is under arrest as a deserter, and liable to be punished by the sentence of a court martial. That being held in custody under authority of the United States, the State courts have no jurisdiction in the premises. The substituted return and the motion for attachment were made for the very purpose of raising the question of our jurisdiction over the case. That Capt. W. W. White is the provost marshal of this district, and has the requisite authority under the act of Congress to arrest the prisoner for desertion, is admitted. Indeed in the present state of the record perhaps it should be assumed that the facts set forth in the return are true as therein stated ; but whether this be so or not, they are admitted by counsel. Being true, do they constitute a valid return ? If they do, then there is an end of this case, for we are destitute of power to afford the redress sought for. But if they do not, then the defendant is in contempt and liable to attachment, by reason of his refusal to produce the body of the prisoner in obedience to the mandate of the writ. If the return alleged nothing more than that the prisoner was detained under and by virtue of his enlistment, we should assuredly feel it to be our duty to enforce obedience by requiring the production of the prisoner to be dealt with as the law might direct. But the return avers that the prisoner has been arrested and is detained for crime under the laws of the United States, and submits that he can only be discharged by a Federal court, or a judge thereof, and that therefore the defendant is not bound to regard the process of a State court, which would

[Shirk's Case.]

or might involve an act of disobedience to the authority by which he is ordered to make the arrest. The question then is, how far a State court or a judge thereof can exercise jurisdiction over the person of a criminal arrested for an offence against the United States and of which the courts of the United States have exclusive jurisdiction? The earlier cases on this subject will be found on examination to be somewhat conflicting, but of later years the courts have endeavored so to mark the line of distinction between the jurisdiction of the State and United States courts, as to avoid conflict, and prevent as far as possible any infringement of either within their respective spheres; so that now the law seems to be settled, that the process of the tribunals of the United States cannot be restrained or interfered with by the courts of the several States. In the case of *Ableman* v. *Booth*, 21 Howard, 506, Chief Justice Taney, in 1858, reviewed the whole doctrine of conflict of jurisdiction, and in an elaborate opinion, which is characterized by his great learning and ability, settles the principles which to me seem to govern this case. That was the case of an arrest of an individual under the Fugitive Slave Law, for aiding and abetting the escape of a slave. The Supreme Court of Wisconsin, after the arrest and subsequently after the conviction and sentence of the defendant, discharged him from imprisonment on habeas corpus on the ground that the act of Congress was unconstitutional, and therefore the arrest and all proceedings under it were unauthorized and void. Chief Justice Taney, in giving the reasons for reversing the judgment, shows clearly the confusion to which such an assumption of power would inevitably lead, and what would be the deplorable consequences if the State courts were permitted to interefere with the process of the Federal courts; and then at page 523 he proceeds thus : "We do not question the authority of a State court or judge, who is authorized by the laws of the State to issue the writ of habeas corpus, to issue it in any case where the party is imprisoned within its territorial limits, provided it does not appear, when the application is made, that the person imprisoned is in custody under the authority of the United States. The court or judge has a right to inquire in this mode of proceeding, by what authority the prisoner is confined within the territorial limits of the State sovereignty. It is the duty of the marshal or other persons having the custody of the prisoner, to make known to the judge of the court, by a proper return, the authority by which he holds him in custody. This right to inquire by process of habeas corpus, and the duty of the officer to make a return, grows necessarily out of the complex character of our government, and the existence of two distinct and separate sovereignties within the same territorial space, each of them restricted in its powers, and each within its sphere of action, prescribed by the Constitution of the United States, independent of the other. But after the return is made, and the State judge or court judicially apprised that the party is in custody under the authority of the United States, they can proceed no further. They then know that the prisoner is within the dominion and jurisdiction of another government, and that neither the writ of habeas corpus nor any other process issued under State authority can pass over the line of division between the two sovereignties. He is then within the dominion and exclusive jurisdiction of the United States. If he has committed an offence against their laws, their judicial tribunals can release him and afford him redress. And although, as we have said, it is the duty of the marshal, or other person holding him, to make known by a proper return, the authority under which he detains him, it is, at the same time, imperatively his duty to obey the process of the United States, to hold the prisoner in custody under it, and to refuse obedience to the mandate or process of any other government. And consequently it is his duty not to take the prisoner, nor suffer him to be taken before a State judge or court upon a habeas corpus issued under State authority. No State judge or court,

[Shirk's Case.]

after they are judicially informed that the party is imprisoned under the authority of the United States, has any right to interfere with him or to require him to be brought before them. And, if the authority of a State, in the form of judicial process or otherwise, should attempt to control the marshal, or other authorized officer or agent of the United States, in any respect, in the custody of his prisoner, it would be his duty to resist it, and to call to his aid any force that might be necessary to maintain the authority of law against all illegal interference. No judicial process, whatever form it may assume, can have any lawful authority outside of the limits of the jurisdiction of the court or judge by whom it is issued; and an attempt to enforce it beyond these boundaries is nothing less than lawless violence."

Is this prisoner in custody under the authority of the United States within the meaning of this decision? Desertion is a crime. It is declared to be such by an act of Congress. It is triable and punishable by the military courts organized under and deriving their authority from the laws of the United States. The act of 2d March, 1863, under which the prisoner was apprehended, provides for the arrest of persons charged with this offence, designates the officer by whom the arrest is so to be made, and directs the manner in which they are to be dealt with after their arrest. He is arrested by virtue of process issued under the laws of the United States, for an offence against their laws, within the exclusive jurisdiction of the courts of the United States. Is not this simple statement enough to prove that he *is* in custody under the authority of the United States? We think so. Then according to *Ableman* v. *Booth*, we have no more authority to release the prisoner, than if he was under arrest for piracy, or aiding and abetting the escape of a fugitive slave. What then is our duty? To assume jurisdiction, right or wrong? The law as pronounced in that case declares that when we are fully apprised by the return of the authority under which the arrest was made, we can proceed no further. Whatever our own views or feelings may be concerning the inconvenience or hardship of the case, we cannot disregard the law as settled by the highest court in the land. We must take the law as we find it written, and obey it, otherwise law becomes no more law.

The counsel for the prisoner argues that the facts, as they appear in the case, show the enlistment to be void by reason of non age, and hence it results that the prisoner cannot be guilty of desertion. That being under arrest for crime of which he cannot be guilty from the very nature of the case, he should be discharged without further proceedings. There is force in the proposition, and we would allow to it due weight, if we had jurisdiction to inquire into the validity of the enlistment or the propriety of the arrest, further than to ascertain by what authority it was made. Were this a case of desertion from the military force of this State, the argument might avail the prisoner here. It was recognized in *Grace* v. *Wilber*, 10 Johns, 453, and impliedly in 1 Mason, 77. But it is to be observed that the first of these cases arose under the military laws of the State of New York, and the other was tried in the Circuit Court of the United States. But would not the assumption of authority by us on such grounds, be fraught with the very mischief which the Supreme Court in *Ableman* v. *Booth*, endeavored to suppress; by laying down a plain rule, and marking distinctly the limits of the jurisdiction of the courts of the State and of the United States respectively, so as to prevent if possible the least clashing or conflict between two distinct sovereignties? The rule is comprehensive, but in order to be efficacious it demands a liberal construction. To evade it by nice or technical distinctions would very seriously impair its efficacy. If we can go behind the return and inquire into the validity of the enlistment, we see no reason why we may not with the same propriety, inquire into the

constitutionality of the act punishing desertion, or of the conscription act under which this arrest was made. But this would be doing the very thing the Supreme Court of Wisconsin did in order to release a prisoner in custody under the fugitive slave law, and upon which Judge Taney animadverts with no slight degree of severity. In applying, as we have felt bound to do, the principles established in *Ableman* v. *Booth*, to the case in hand, we find support in the decisions of our own State. In *Com.* v. *Gamble*, 11 Serg. & Rawle, 93, the defendant made return to the writ of habeas corpus that the prisoner claimed to be a minor was under arrest as a deserter. Justice Gibson, in pronouncing the judgment of the court, uses the following language: "But there is, if it were necessary to resort to it, another ground independent of this, on which the person whose liberation is in question must be remanded. It appears by the return of the writ of habeas corpus that he is in confinement on a charge of desertion from his post, and the law is clear, that he must abide the sentence of a court martial, before he can contest the validity of the enlistment. There would be an end of all safety if a minor could insinuate himself into an army, and after having perhaps jeoparded its very existence, by betraying its secrets to the enemy, escape military punishment by claiming the privileges of infancy. The very camp followers are subject to military law. The same principle is equally applicable to the marine and naval service. But the principle is so well established, and so generally understood, that it is believed unnecessary to enlarge on it, or cite an authority in support of it." The case of *Com.* v. *Fox* does not at all conflict with this ruling, because there the return did not state that the minor *was held under arrest* for desertion. Nothing more than that he had deserted and afterwards surrendered himself. This important distinction is noticed by Justice Coulter. "It does not appear," he says, "from the return of the officer, that the minor is *under arrest for the crime of desertion*, and is to be tried by a court martial." There is a wide difference in effect between a return to a writ of habeas corpus, alleging desertion and a subsequent surrender, without saying whether the party is held to answer the crime before a court martial, and a return which apprises the court or judge that the party is under actual arrest for desertion, and is about being taken to the place designated by law to await the action of the military authorities. When this case was first presented we did not doubt our jurisdiction, knowing that it was every day practice for State courts and judges to discharge minors unlawfully held to military service; and we therefore supposed that the only subject of inquiry would be the age of the prisoner when he enlisted. Since the case of *Ableman* v. *Booth* has been brought to our notice, we have tried to find some way of escape from it, that would not be inconsistent with a due regard to duty, so as to save, if practicable, the trouble and expense to which the relator will be probably put in seeking relief at the hand of another tribunal. But the more we have read and reflected upon the subject, the more firmly we have been impressed with the conviction that our jurisdiction extends no further than to inquire by what authority the prisoner is held. An attempt on our part to release the prisoner would be a plain and palpable violation of the law as we read it. But for this obstacle we should feel it our duty to liberate him. We therefore adjudge the return sufficient, and the motion for attachment is refused.

NOTE.—To the same effect is the decision of E. Darwin Smith, J., Sup. Court N. Y., in *Jordan's Case*, 2 Law Reg. 749.

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

NOTE.—The following three cases, argued and decided together, involve the question of the constitutionality of the act of Congress of March 3d, 1863, commonly known as the *Conscription law.* The cases have not yet been before the court of last resort in this State, in form, although in fact all the judges of that court sat at the argument at *Nisi Prius,* and have delivered opinions in the cases. In order to a correct understanding of the cases, the reporter has deemed it proper to precede them with this short note of their history.

While Mr. Justice WOODWARD was holding the Court of *Nisi Prius,* bills were filed therein with a prayer for a preliminary injunction, the nature of which fully appears in the report of the cases. Upon hearing, the court, per C. J. LOWRIE and J. J. WOODWARD and THOMPSON, held the law to be unconstitutional, and granted the preliminary injunctions as prayed for—J. J. STRONG and READ dissenting, and so the case is first reported.

The official term of Mr. Justice LOWRIE expired on the first Monday of December, 1863, on which day Hon. DANIEL AGNEW, who had been elected at the previous October election, took his seat as a Justice of the Supreme Court for the period of fifteen years from that date.

On the 12th day of December, 1863, defendants' counsel appeared in the Court of *Nisi Prius,* then held by Mr. Justice STRONG, and moved the court to dissolve the injunctions previously decreed. A rule to show cause was granted, and the 30th day of December, 1863, fixed for the argument of the case; and the other justices of the court, at the request of Mr. Justice STRONG, took part with him in the hearing and adjudication thereof. After arguments by both parties, the court, per Justices STRONG, READ, and AGNEW, reversed the former decision of the court, declared the law to be constitutional, and dissolved the preliminary injunctions previously granted—C. J. WOODWARD and J. THOMPSON dissenting, and hence the latter ruling is the authoritative construction of the act of Congress in this State.

For the information of those not familiar with our practice in such cases, I may mention that, after answers filed by defendants, the case may be reargued at *Nisi Prius,* and from there certified to the Supreme Court in banc, when, if the decision is adverse to the constitutionality of the act of Congress, it may be removed by appeal to the Supreme Court of the United States as the court of last resort.